Cosette Faust NEWTON et vlr., Appellants,

v.

TOWN OF HIGHLAND PARK et al.,
Appellees.

No. 14915.

Court of Civil Appeals of Texas.

Dallas.

July 15, 1955.

Rehearing Denied Oct. 7, 1955.

Bradford & Pritchard and H. Louis Nichols, Dallas, for appellants.

J. C. Muse, Jr., and Wynne & Wynne, Dallas, for appellees.

DIXON, Chief Justice.

This is an appeal from a permanent injunction, both prohibitory and mandatory, in favor of appellees, Town of Highland Park and an intervenor, Kathleen Gibson, against appellants F. H. Newton and his wife Cosette Faust Newton, restraining appellants from excluding the Town's inspectors from appellants' premises, and requiring appellants to dismantle, raze, and remove certain structures on their residence property at 4005 Miramar Avenue in Highland Park, Texas, found to violate the Town's zoning ordinance and building code, and also to be nuisances and fire and health hazards.

### I. Preliminary Statement

This controversy resembles the Hundred Years War in that it has gone on intermittently and bitterly for a long time. It is therefore not surprising that the record on appeal is voluminous and the details numerous and involved. The statement of facts contains 675 pages of testimony, and 201 exhibits including ordinances, letters, and pictures. The transcript is 399 pages long. Appellants have seriously briefed 27 points on appeal. Though we shall give only a most condensed account of the matters presented in the record, this opinion cannot be brief.

By way of an advance summary: We have concluded that the court's judgment should be sustained in most particulars because of violations of the Town's zoning ordinances, as to which violations appellants' pleas of estoppel, under the facts shown by the record, are not valid defenses. Parts of the court's judgment as set out in two separate paragraphs should be sustained on grounds of nuisance and fire hazard. Other parts of the court's judgment as set out in four separate paragraphs, should not be sustained because special is-

sues on nuisance and fire hazard were not properly submitted. We shall therefore affirm the trial court's judgment in part and reverse and remand in part.

The validity of the Town's zoning ordinance and building code has not been challenged by appellants; there is no issue in the case involving their validity.

The suit was filed July 3, 1953 by the Town of Highland Park against Cosette Faust Newton and her husband F. H. Newton. Plaintiff, an appellee here, alleged that certain of the improvements constructed on the premises by appellants were erected in violation of the Town's ordinances and, in addition, constituted nuisances and fire hazards. Thirteen citizens as intervenors joined the Town in its allegations. Appellants filed their denial and in addition pled consent, estoppel, limitations, laches, and failure to do equity. They also filed a cross-claim, which is not a part of this appeal as the Court, prior to trial and under authority of Rules 41, 97(h), and 174, Texas Rules of Civil Procedure, severed said cross-claim from the cause filed by the Town of Highland Park.

On July 6, 1953 by agreement a restraining order was granted forbidding appellants from erecting or constructing any new buildings or altering any structures already existing on the premises at 4005 Miramar Avenue. On August 17, 1953 after a hearing the restraining order was made into a temporary injunction. On August 27, 1953 appellees filed motions to hold appellants in contempt for violating the restraining order and injunction. After a hearing the court quashed these motions. However at a later hearing the court announced that the evidence indicated that appellants had possibly violated both the restraining order of July 6, 1953 and the temporary injunction of August 17, 1953, and the court thereupon enlarged the temporary injunction by adding a provision that appellants were forbidden to carry on "any work or activities of any kind or character except normal routine household activities."

In a trial on the merits begun April 19, 1954, the answers of a jury to the twenty-three submitted issues were as follows: (1) The property at 4005 Miramar as it existed with all its structures, attachments, fences and barricades was a nuisance; (2) it was also a fire hazard; (3) the swimming pool bred mosquitoes; but (4) did not endanger the health of the citizens of Highland Park; (5) the physical condition of the rear yard was unsanitary; but (6) did not endanger the health of the citizens of Highland Park; (7) the physical condition of the two-story dwelling, with its barred windows and doors, fences and barriers constituted a fire hazard; (8) the manner in which the Newtons attempted to repair the brick wall on the rear of the premises was reasonable; (9 to 19, inclusive) the officers and agents of the Town of Highland Park did not use reasonable diligence to cause removal of certain structures specifically described in said issues; (20) the conduct of appellee's building inspector in 1941 led the Newtons to believe that it was permissible for them to construct and use the structure known as S.S. Miramar and its attached walkway; (21) after completion of S. S. Miramar appellee's building inspector approved the Newton's use of such structure; (22) the S. S. Miramar and its connecting bridge were constructed in 1941 with the knowledge and consent of appellee's building inspector; and (23) the barred outside doors and windows constituted a fire hazard.

The trial court overruled appellants' motion for judgment on the verdict and appellants' motion for judgment non obstante veredicto, dismissed the cause of action of twelve of the thirteen intervening citizens, and sustained the motions of appellees Town of Highland Park and Kathleen Gibson to disregard the jury's answers to issues Nos. 4, 6, and 9 to 22 inclusive, and on May 18, 1954 rendered judgment in favor of said appellees.

The judgment entered by the court enjoined appellants from preventing the Town's inspectors from coming on the premises, and in addition commanded appellants to dismantle, raze, and remove from their property within ninety days the following structures: "(a) The fence along

the North front line between the West and East property lines of the above-described premises, including the gates, overhead doors and supporting members of said structure; (b) the solid iron elevator doors erected as a fence or barrier immediately South of the front fence mentioned in paragraph (a) above; (c) the fence in the front yard immediately in front of the main dwelling and extending from the West property line to the driveway on the East, being approximately ten feet in height and covered with sheet metal; (d) the fence on the West property line from the street line to a point in said West property line where a line projected from and parallel to the North line of the main body of the main dwelling intersects the West property line; (e) the fence and sheet metal barriers on the East line of said property, a part of which fence is now placed upon the property owned by intervenor Kathleen Gibson, from the street line to a point on the East property line of said property where a line projected from and parallel to the North line of the Main body of the main dwelling intersects the East property line of said property; (f) the fence on the West side of the driveway from the street line of said property back to where it attaches to the porte-cochere of the main dwelling, together with the arched metal framework over said driveway; (g) the entire porte-cochere on the East side of the main dwelling, ordered removed by the Board of Adjustment in October 1939, including the overhead door and enclosures placed thereon during the year 1953; (h) all umbrellas with their foundations and all picket fences, barriers, barricades and structures of every kind located in the front yard with the exception of one umbrella on the West side of the front yard and one umbrella on the East side of the front yard provided that such umbrellas are not permanently attached to the ground; (i) the large umbrella mounted on the roof of the front porch of the main dwelling; (j) the shed in the rear yard attached to the brick wall on the East property line, including all of the supporting members and the sheet metal enclosing the West side of such shed; (k) the structure in the rear yard known as S. S. Miramar and the bridge that connects it to the main dwelling and all structures attached to and a part of said ship; (1) the structure made of welded pipe and covered with mesh wire and screen located in the rear yard South of the S. S. Miramar and enclosing the entire area occupied by the swimming pool and its structures; (m) all bleacher seats and other structures on top of the greenhouse at the East end of the swimming pool; (n) from the fence along the rear property line, all wire, link fences and sheet metal that extend higher than the top of the brick portion of such fence; (o) all signs painted on the outside of all outside walls and fences that are not ordered removed; (p) the fence and walls on the South line of said property along the alley shall be made to conform in height to the height of the brick wall on the East property line, the height of which is approximately nine feet; (q) the fence on the West property line extending from a point opposite the North line of the main body of the main dwelling to the alley on the South line shall be made to conform in height to the height of the brick wall on the East property line, the height of which is approximately nine feet; (r) all exterior iron bars and barricades on the front porch of the main dwelling and the iron and steel bars, barbed-wire mats and metal panels that cover the exterior of the outside doors and windows of the main dwelling; and (s) all junk, barbed-wire entanglements, mats, debris, trash and rubbish in the front, rear and side yards of said premises, including all debris and trash in the swimming pool; and to restore the rear yard of said premises known as 4005 Miramar Avenue in the Town of Highland Park to a sanitary condition; * * *."

As part of its judgment the trial court included the following findings and conclusions: "(1) That the evidence was undisputed and uncontroverted on the matters raised by the pleadings as to the violations of plaintiff's Zoning ordinance and building code in the erection of the buildings, structures, barriers and fences both as to the time of erection and the extent of the structures."

## II. Facts

The Town of Highland Park, Texas, lies contiguous to the City of Dallas, Texas, but is a separate incorporated municipality. It is primarily a residential section given over principally to homes of the better type.

At all times material to this controversy there were ordinances in effect regulating the construction of improvements in the Town including a zoning ordinance, and a building code which required a permit to be taken out for the erection of structures on real property. These ordinances are lengthy and consideration of space forbids our copying them here.

The zoning law divides the Town into various districts including Single Family Dwelling Districts and A-Area Districts, prescribes the types of improvements which may be constructed within each district, the uses to which such improvements may be put, regulates the area of front, rear, and side yards, the open spaces which are required to be left after the erection of improvements, the accessory buildings which may be constructed, and other matters.

The property involved herein, a lot 71' by 225½' with improvements thereon, is in a single family dwelling district and in an A-Area district. When the Town's zoning ordinance was passed in 1929 the improvements consisted of a two-story brick veneer house with appropriate accessory buildings such as garage, etc. Later a swimming pool was constructed in the rear yard. These improvements fully conformed to the provisions of the Town's ordinances. It is the additional structures which have been built on the property since October 1939 and conditions that have arisen since then which form the subject matter of this controversy.

In 1939 appellants added a porte-cochere to the east side of their house. Its east supports rested on the east property line and its roof comes closer than five feet to the neighbor's property line, so violated sec. 8(3) of the zoning ordinance. Appellants had not applied for or received a permit to construct the porte-cochere. It was built in violation of the Town's ordinance No. 516, sec. 1.

The porte-cochere was almost completed before the Town authorities discovered its existence. They ordered work on it stopped. Appellants then applied for a permit to finish it. After a hearing the Board of Adjustment refused the permit and ordered the structure removed. Appellee asserts that under Art. 1011g, V.A.C.S. the decision of the Board became final and is now res adjudicata.

In 1953 an overhead door and some enclosures were added to the porte-cochere, also without a permit and in violation of the zoning ordinance.

On August 4, 1941 appellants made application for a permit to build a pergola in their rear yard between their house and their swimming pool in the form of an oval approximately 30' by 20' at an estimated cost of $250. The application recited that the pergola was to be built over an outside terrazzo floor (already in existence), and that "There is no new electric work * * * or anything except the wood work, of 20 pillars and roof and perhaps screening * * *." The permit was granted.

Before it was finished some months later this "pergola" had become a building so constructed as to resemble a ship. Its construction had cost $60,000 instead of the $250 estimated in the building permit.

Appellants gave their structure the name "S.S. Miramar" and "launched" it with fanfare. In connection with the occasion a pamphlet was published containing sketches of the exterior and pictures of the interior. This pamphlet is entitled "An Invitation To the Garden Ship of Dreams. Dr. Cosette Faust Newton extends her hospitality and the facilities of the S.S. Miramar for private parties." The statement printed inside the pamphlet describes the S.S. Mirama and gives an idea of the use for which it was intended, so we herewith copy the statement:

" 'Captain' Newton launched the S.S. Miramar December 13, 1941. This huge ship consists of three spacious decks, ac-

commodating hundreds of persons. The lower deck, which is entered from the terrace, is an oval 48′ x 29′. Built-in seats encircle an excellent *terrazo* dance floor. A steam-heated swimming pool, with tropical background-colorful tea tables, presents a panorama of breath-taking beauty. Adjoining the pool are rustic bar, soft drink dispenser, fireplace and powder rooms. The S.S. Miramar is air-conditioned throughout and has microphone, recording and musical equipment. The second deck, which is the promenade, overlooks the dance floor. Gaily upholstered deck chairs and sports equipment complete the furnishings. The third deck (open to sun, moon and stars) has leather upholstered life-boats, used as swings. It has sun-tanning 'chaise lounges,' the U. S. Flag floating from a real mast, a pilot's wheel, captain's bridge, masts, beams, etc. The S.S. Miramar was recently ·featured by Universal News Reel in Stranger Than Fiction. 'Captain' Newton's invitation includes dancing, swimming, luncheons, bridge, barbecues, and picnics. For further information call Purser Gloria Finley,. Central 9003." A bridge, or walkway, was also constructed extending from one of the ship's decks to the second-story rear porch of the main residence.

A poem was also published by "Captain" Cosette Faust Newton entitled "How The S.S. Miramar Happened." As this poem is revealing in many ways and corroborates other evidence that the structure, was not built according to any prepared plans, certainly not in compliance with the permit to built the pergola, we quote excerpts from it:

"One morning at breakfast I lightly said ' ·

 * * * * * *

Let's put a permanent canopy above the *terrazo;*
We need it, you see. * * *

"Yet it never started as a ship at all,—
As a yacht, a sampan, or fishing-yawl.
Indeed, I must confess to you
That the planless building, like Topsy, just grew!

"The carpenters came like children to school
Where I taught them to work without eve or rule;
For I was determined no line should be straight—
From the curving front to the curved back gate.
But the carpenters uttered angry cries,.
And their dispositions died like flies..

 * * * * * *

At first the building was meant to be
A single story of eight feet-three;
But then I thought I would like to try
To make at balcony seven feet high
To hold the piano and tables ' and chairs—
But then began my real nightmares:
An engineer came prancing along,
And began to make the building strong
With ugly posts to support and prop—
But I gave my final peremptory, 'Stop!'

 * * * * * *

And then I remembered .a Siamese swing
And my bold instructions began to ring:
'Oh, let us have beams and bolts,' I cried;
'We will take the balcony for a ride—
And swing its naughty weight from above';
* * *."

Bleacher seats overlooking the swimming pool were constructed atop the greenhouse at the east end of the pool. A large steel framework overlaid with mesh wire and screen was later built to cover the bleacher seats and swimming pool.

The record shows that during the nine months following completion of the S.S. Miramar numerous parties were given in the ship, including dances, graduation parties, debutante parties, and a party given by the Atlantic Oil Company for which the company paid a fee of $100 for. use of the ship. In September 1942 Mrs. .Newton sought a permit to operate what she called "The International Club." The Town Council refused to grant the permit.

It is undisputed that in 1942 in response to complaints the town authorities ordered the ship to be "closed down." Mrs. Newton agreed to do so. Soon thereafter sometime in 1942 the Newtons changed their place of abode to an address on Oak Lawn Avenue in the City of Dallas "because that was a commercial district where we could put on what she desired to do."

The S.S. Miramar and the uses to which it was put violated Sections 3(1) and (9) of Ordinance No. 293, the original zoning ordinance. Having been erected without a permit, its construction also violated the building code.

The Newtons did not move back to 4005 Miramar until 1948. During the six years they lived elsewhere many of the furnishings and other properties remained at 4005 Miramar. During this interval the property was visited by intruders seeking either to burglarize the place, or to satisfy their curiosity about it. Many of them took with them souvenirs in remembrance of their visit. A child was drowned in the swimming pool in the spring of 1948. An extensive damage was done by these intruders. This and other matters caused a renewal of the controversy soon after the return of the Newtons in 1948.

Upon their return the Newtons erected a wire fence along their front property line; another fence paralleling the first across the front yard immediately in front of their two-story house; and still another along the west line of the front yard. Fences in the rear were elevated to a height of sixteen to twenty feet.

On May 1, 1948 a petition was signed by thirty-five neighbors complaining of the S.S. Miramar, the double fences in front and side, and the refuse, litter, and stagnant water in the swimming pool.

Soon after the petition was received the Town authorities took the matter up with appellants in person and by letter. The Town Attorney and Dr. F. H. Newton held a conference and an agreement was reached providing for the removal of certain structures and the correction of some of the objectionable conditions. As a result Mrs. Newton filed her application for a permit to make certain repairs, including repairs to the S.S. Miramar. Mrs. Newton in a letter June 29, 1948 to Mr. Allen, Building Inspector, agreed to "Tear off superstructure of ship * * * Remove same from premises . * * * Tear down the 1,000 sq. ft. ordered * * * towit, present garage, tool houses, picnic house, etc." On September 11, 1948 a permit was issued to Mrs. Newton which included the repairs to be done on the ship.

But there were further delays and more correspondence. On August 19, 1948 the Town Attorney wrote to Dr. F. H. Newton insisting on a compliance with their agreement. On January 11, 1949 Mr. Allen, Building Inspector, wrote insisting that the superstructure of the ship be removed as agreed. On May 26, 1949 the Town Attorney again wrote to Dr. F. H. Newton. Dr. Newton replied by letters dated January 14, 1949, June 3, 1949, August 24, 1949 and August 9, 1951 promising to proceed with the work agreed to, but requesting additional time, and thanking the authorities for their patience.

The Town Attorney testified that though Dr. F. H. Newton agreed to take down the fences, he requested that the authorities "go easy" with him as he was going to have trouble with his wife about the fences because she was afraid to stay on the premises without the fences. The attorney in explaining why the authorities had not sooner taken legal action, testified in effect that the Town officials believed that the prominence, position and good judgment of Dr. F. H. Newton and his reputation as a good and law-abiding citizen would result in a correction of the situation.

Meantime appellants employed an attorney and on October 23, 1951 on application of the attorney a permit was issued to Mrs. Newton to make certain repairs and build a brick garage provided she first removed certain named structures.

In 1953 appellants erected a metal shed extending from the porte-cochere rearward for 58.4 feet and being 10 feet wide—a

total of 584 square feet. This shed is attached to the rear east wall. No permit was applied for or obtained for the erection of this structure, so it violates Ordinance 516, sec. 1, Building Code. In addition it violates the side yard requirement of Section 8–3; it is less than 100 feet from the front line, so violates Section 3–B–(1); it violates the special area requirements of Section 12–3; and it further decreased the open space in the yard which was already less than the 65% required by Section 8–(7) —the last four references being to the Zoning Ordinance.

Subsequently further negotiations were entered into which culminated in another agreement and permit in March 1953. The sworn agreement signed by both Dr. F. H. Newton and his wife March 24, 1953, was in part as follows:

"1. Dismantle and remove from the premises: a. Recreation or 'ship' building. b. Steel frame and wire over swimming pool area, including the spectator seats over greenhouse and west Pavilion. c. The walk extending from second floor of dwelling to second floor balcony of 'ship' building. d. The mechanical equipment and other sheds or buildings in rear yard, excepting the greenhouse, west Pavilion, powder room and swimming pool." Paragraphs 2 and 3 of the agreement provide for certain repairs and additions including repair of the swimming pool and the boundary walls, and the addition of a fire escape to the attic on the east side of the dwelling.

On the part of the Town the agreement provided: "We have given these matters our consideration and it appears that the proposed changes are permissive under the provisions of the Zoning Ordinance. We will, therefore, issue building permits under the following conditions: (1) Issue a permit for the dismantling and removal of the structures under Item No. 1 and the repairing of the items listed under No. 2 above. (2) After the removal of the structures listed under No. 1 has been substantially completed, a permit will be issued covering the additions under Item No. 3, provided, however, that plans shall be submitted for the additions to the residence showing such additions are to be made in a substantial manner and in keeping with the architectural design of the residence. * * *." As part of this agreement a permit was issued to Dr. F. H. Newton on March 27, 1953.

But the controversy was not at an end. Appellants did not dismantle or remove the structures, including the ship, named in the agreement and permit. On the contrary they made additional improvements: Two overhead doors and metal barriers were installed in the driveway, elevator doors were installed as fence barriers in the front yard, and the second fence crossing the front yard was reinforced with sheet metal. It was these additional structures which precipitated the filing of this suit.

Appellees' witnesses testified that the Town's officials and employees were forbidden to come onto the premises to make necessary inspections and were not even allowed to remove trash and garbage without special permission obtained in advance. There is testimony that on several occasions appellant Cosette Faust Newton threatened the Town's inspectors with a gun. It is undisputed that on one occasion the Town's employees were ordered from the premises and forbidden to return.

Appellants have barricaded their property with fences, with walls with glass embedded on top, with barbed-wire entanglements, with barred windows and doors, and have caused warning signs to be painted on the rear walls. An inspector for the Town's Fire Department testified that due to these barriers firemen would have no means of access to the property in the event of a fire.

On each side of the front yard appellants constructed a concrete patio, circular in form and twenty to twenty-five feet in diameter. Surrounding each patio is a red picket fence covered with tarpaulin. Entrance to each patio is through a steel gate supported by steel posts. On one of these patios appellants have placed seven large metal umbrellas, beach type, standing in sockets embedded in concrete. On the other patio are five similar umbrellas. Mrs.

Newton testified that these structures were built to protect her from the depredations of persons who sometimes carelessly and recklessly threw things such as stones, bottles, etc., over the fences and walls into the yard. These structures, according to the testimony, occupy sixty to seventy percent of the front yard, and violate Section 8–A–(1), (3) and (7) of the Town's zoning ordinance.

### III. Opinion

■ We agree with the finding of the trial court that the evidence was undisputed and uncontroverted on the matters raised by the pleadings as to violations of the Town's zoning ordinance and building code in the erection of the buildings, structures, barriers, and some of the fences involved herein. Appellee's pleadings are sufficiently specific and the undisputed evidence is sufficient to uphold the court's judgment as to such violations. To particularize, it is for such reason that paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (j), (k), (l), (m), and (o) of the court's judgment are sustained.

Appellants in their first, second, third, sixth, eleventh, twelfth, thirteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second, and twenty-third points on appeal assert expressly or in substance that the Town of Highland Park is estopped by laches, limitations, and lack of diligence from enforcing its ordinances as to certain of the structures in controversy. The structures in question include those named specifically in paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (j), (k), (l), (m), (n), (o), (p), (q), and (r) of the court's judgment as heretofore set out.

■ After careful consideration we have concluded that under the facts peculiar to this case we should and we do hereby overrule the above-named points on appeal in so far as they seek to assert the defense of estoppel. The general rule is that cities in the discharge of their governmental as distinguished from their proprietary functions cannot be bound or estopped by unauthorized acts of their offi-

cers. Rolison v. Puckett, 145 Tex. 366, 198 S.W.2d 74; Edge v. City of Bellaire, Tex. Civ.App., 200 S.W.2d 224 (writ ref.); Davis v. City of Abilene, Tex.Civ.App., 250 S.W.2d 685 (writ ref.).

It is true that there are exceptions to the general rule. The rule as to the exceptions has been stated by our Supreme Court in City of San Angelo v. Deutsch, 126 Tex. 532, 91 S.W.2d 308, 311: "The opinion is expressed in a number of decisions that a city may be estopped even when it is acting in its public capacity *if it has received or accepted benefits from the transaction.* * * In such case exception is properly made to the general rule which has been discussed, because there is added to the equities existing in favor of the individual on account of his reliance and injury the established and compelling equitable principle that the city may not, after having accepted benefit from the unauthorized act, repudiate it so far as it imposes an obligation upon it or is disadvantageous to it." (Emphasis supplied). We find no fact or circumstance in the record of this case which would justify our holding as a matter of law that the Town of Highland Park has received or accepted benefit from appellants' violations of its Zoning Ordinances.

Appellants cite us, among others, the cases of City of Dallas v. Rosenthal, Tex.Civ. App., 239 S.W.2d 636 (Ref. n. r. e.), and Town of Highland Park v. Marshall, Tex. Civ.App., 235 S.W.2d 658 (Ref. n. r. e.). Both of the cases involved nonconforming uses. The properties had been used for nonconforming purposes from a time prior to the enactment of zoning ordinances, hence the owners had a vested right to their nonconforming uses and structures. This distinction is pointed out in Davis v. City of Abilene, supra.

■ There is another reason for our overruling appellants' points on appeal with reference to estoppel. Equitable estoppel consists of several elements: (1) A false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of the facts; (3) to a party without knowledge, or the means of knowl-

edge of the facts; (4) with the intention that it should be acted on; and (5) the party to whom it was made must have relied or acted on it to his prejudice. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929; Noxon v. Cockburn, Tex.Civ.App., 147 S.W.2d 872; 17 Tex.Jur. 137.

Special issues covering the elements of estoppel as above named were not submitted to the jury in this case. It is true that the jury in answering issues Nos. 9 to 19 inclusive, found that the Town authorities did not use reasonable diligence to cause removal of certain named structures. But lack of diligence is not sufficient of itself alone to establish estoppel for it does not include all the necessary elements. The burden was on appellants to plead and prove the essential facts which constitute estoppel, and further, to request the court to submit appropriate issues. So far as the record shows they did not request such issues. Under Rule 279, V.R.C.P. the defense of estoppel was thereby waived. Pacific Finance Corp. v. Gilkerson, Tex.Civ.App., 217 S.W.2d 440 (Ref. n. r. e.). The court properly disregarded the jury's answers to issues Nos. 9 to 19 inclusive, and 20 to 21 inclusive.

Appellants in March 1953 had expressly agreed in writing, as hereinbefore stated, to remove the S. S. Miramar as one of the conditions of their obtaining a building permit to erect other structures. By entering into this agreement, appellants in effect waived any claim of estoppel as to the S. S. Miramar. Therefore the trial court for such additional reason properly disregarded the jury's answers to issues Nos. 20 to 21 inclusive.

Appellants objected to the court's definition of nuisance on the ground that it attempted to cover public and private nuisances in one definition. The difference between private and public nuisances is as to the parties affected and the remedies available, not as to the nature or quality of the wrong. We agree with this statement in 39 Am.Jur. 284–285: "The constituents and definitions of a nuisance and the quality of the wrong are the same whether the nuisance is public or private, and the jurisdiction of the courts over both classes of nuisances rests upon the same principles and goes to the same extent. * * *, a nuisance may be both public and private in character; or, in other words, a public nuisance becomes also a private nuisance as to any person who is specially injured by it to any extent beyond the injury to the public. Nuisances of this kind are sometimes called united nuisances." Appellants' point No. 5 is overruled.

In their eighth point on appeal appellants assert that special issues Nos. 1, 2, and 5 submitted by the court are too general and cover more than one structure. Special issue No. 1 is as follows: "Do you find from a preponderance of the evidence that the Newton property at 4005 Miramar, Highland Park, as such property now exists with all its structures, attachments, fences and barricades, is a nuisance, as defined herein?" Issue No. 2 was worded the same except that it inquired about a fire hazard. Issue No. 5 inquired whether the present physical condition of the back yard was unsanitary. The jury answered Yes to all three questions.

We agree that issues Nos. 1 and 2 are too general. Appellees had pled and introduced evidence to the effect that certain of the structures on the premises constituted nuisances or fire hazards and should be dismantled, razed and removed. But appellees do not contend that all the structures on the property were nuisances or fire hazards. In fact it is admitted by appellees that at the time the zoning law was passed the two-story brick residence, with its accessory buildings, complied in every way with the law and the Town's ordinances. Yet the general nature of the two issues and the jury's answers thereto amount to a condemnation of the whole property, and furnished no guide for the trial court to determine which structures should be dismantled, razed and removed, and which were entitled to remain. Indeed, if we accept the answers to the two issues as proper support for a judgment, the court could have looked to them as sufficient bases for ordering every structure on the

premises at 4005 Miramar to be dismantled, razed and removed as nuisances or fire hazards.

Appellees contend that the two special issues were properly submitted as global issues under authority of Grieger v. Vega, Tex., 271 S.W.2d 85. We do not believe that the holding in the above-cited case is applicable to the facts in this case. The ultimate issue in the Grieger case was whether a killing was wrongful. The evidence developed several possible reasons or grounds for finding the killing wrongful, any one of which was sufficient if the jury believed it to exist as a fact. Under such circumstances it was proper to group all the elements together in the one ultimate issue as to whether the killing was wrongful. A similar situation is presented in a divorce suit in which an ultimate issue is cruel treatment and the plaintiff alleges several specific acts of misconduct in support of the charge. It is not necessary to submit to the jury an issue as to each of the alleged acts of misconduct. It is permissible to group them into the one ultimate issue of cruel treatment.

But in the case now before us each of the structures which appellees seek to dismantle, raze, or remove presents an ultimate, independent, and determinative fact issue as to nuisance and also as to fire hazard. For example, the porte-cochere presents an ultimate issue; the S. S. Miramar presents an ultimate issue; the steel frame and wire over the swimming pool and bleacher seats presents an ultimate issue; and the metal shed 58 x 10 feet in the rear yard presents an ultimate issue. Certainly it cannot be said that if the jury finds any one of them to be a nuisance, or a fire hazard, such finding is sufficient to order all of them dismantled, razed, or removed. The fact situation here is not one which permits submission of the all-inclusive type of global issue such as issues 1 and 2 in this case. Rule 277, V.R.C.P.; Gulf States Utilities Co. v. Wooldridge, Tex.Civ.App., 90 S.W. 2d 325.

We sustain appellants' eighth point on appeal in so far as it pertains to special issues Nos. 1 and 2.

We also agree with appellants that courts will not order the destruction of an entire building as a nuisance or a fire hazard if the condition can be corrected by alterations or repairs. The rule has been stated by our Supreme Court in City of Houston v. Lurie, 148 Tex. 391, 224 S.W.2d 871 at page 877, 14 A.L.R.2d 61: "It may be condemned as a nuisance after judicial determination of the fact that it is a nuisance and of the fact that the conditions which make it a nuisance cannot be corrected without making repairs that would amount to a substantial reconstruction of the building. Crossman v. City of Galveston, 112 Tex. 303, 311, 247 S.W. 810, 26 A.L.R. 1210." In the case at bar no issues were submitted to the jury inquiring whether the nuisance or fire hazard could be abated by the cleaning, disinfection, alteration, or repair of the buildings in question. Therefore we hold that issues of nuisance and fire hazard may not be looked to to support the court's judgment ordering certain structures to be dismantled, razed, or destroyed.

We sustain appellants' third and fourth points on appeal in so far as they assert that there is no finding by the jury that the structures in question would have to be removed in order to abate the nuisance.

In answer to issue No. 3 the jury found that the swimming pool bred mosquitoes, but said in answer to issue No. 4 that such fact did not endanger the health of the citizens of Highland Park. Similarly the jury found that conditions in the rear yard were unsanitary, but said in answer to issue No. 6 that such condition did not endanger the health of the citizens of Highland Park.

We think the court properly disregarded the jury's answers to issues Nos. 4 and 6. Breeding places of mosquitoes are nuisances per se. Art. 4477–1, sec. 2(a)–(h); and our statutes require premises to be kept in a sanitary condition. Art. 4477–1, § 4(a). We overrule appellants' seventh point on appeal.

In answer to special issue No. 23 the jury found that the barred outside doors and windows constituted a fire hazard. As

appellants themselves requested submission of the issue and there is sufficient evidence to support the jury's answer, we think the court in paragraph "r" of its judgment properly ordered these barricades removed. Appellants' twenty-third point on appeal is overruled.

Appellants in their twenty-sixth point complain because the trial court restrained them from "excluding from the premises * * * the building inspector, assistant building inspector, fire marshal, and health officer of the Town of Highland Park in making official examination and inspection of said premises * * *." The Town of Highland Park has a right to supervise the construction, maintenance, and repair of buildings within its city limits. City of Tyler v. Ingram, 139 Tex. 600, 164 S.W.2d 516. In our opinion the evidence fully supported the court's order. We overrule appellants' twenty-sixth point.

As heretofore stated we have concluded that the greater part of the trial court's judgment should be sustained because of violations of the Town's zoning ordinance, some parts sustained on grounds of nuisance, public health and fire hazard, but that other parts should not be sustained because of an improper submission of special issues on nuisance and fire hazard.

Rule 434, V.R.C.P. provides that if error affects a part only of the matter in controversy, and the issues are severable, the judgment shall only be reversed and a new trial ordered as to that part affected by such error.

Pursuant to said Rule we affirm the trial court's judgment in favor of appellees Town of Highland Park and Kathleen Gibson restraining appellants from excluding from the premises in question the Town's building inspector, assistant building inspector, fire marshal and health officer; and we affirm also the mandatory injunction granted by the trial court in so far as it requires appellants to dismantle, raze, and remove certain structures as set out in paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (j), (k), (l), (m), (o), (r), and (s).

We reverse and remand for another trial those parts of the court's judgment set out in paragraphs (i), (n), (p), and (q).

Affirmed in part and reversed in part.

## On Rehearing.

Appellants have prepared and have requested that we adopt about twenty-six suggested additional findings of fact. Some of the proposed findings are undisputed and we see no need for enlarging this opinion by a detailed enumeration of them. However in the hope that it may be of some assistance in clarifying the situation, we make the following additional findings and conclusions:

(1) The maximum space appellants are permitted to cover with structures under the Zoning Ordinance of the Town of Highland Park is 5,603 square feet.

(2) The following structures on the premises occupied the number of square feet of space shown:

| Structure | Square feet |
| --- | --- |
| Residence | 2,439 |
| Porte-cochere | 592 |
| S. S. Miramar | 1,028 |
| Bridge from house to ship | 210 |
| Structure over swimming pool | 1,225 |
| Bath house west of pool | 165 |
| Bamboo room east of pool | 132 |
| Enclosed driveway structure | 540 |
| Shed | 584 |
| Patios | 891.75 |
| Old garage and tool shed | 1,000 |
| Total | 8,896.75 |

(3) All of the above structures were on the premises in 1941 except the shed containing 584 square feet, the driveway structure of 540 square feet and the patios containing 981.75 square feet. Deducting the area of these last three structures leaves 6,791 square feet covered by structures on the premises in 1941.

(4) The old garage and tool house were removed in 1951, so that its square footage of 1,000 feet must be deducted from the

8,896.75 total square feet shown in paragraph 2 above, leaving 7,896.75 square feet as the space covered by structures at the time of the trial.

(5) The structures described in paragraphs (a), (b), (c), (d), (e), (f), and (h) of the trial court's judgment violated sec. 8–(1) and (3) of the Town's zoning ordinance.

(6) The shed referred to in paragraph (j) of the trial court's judgment violated sec. 8–(3); sec. 3–B–(1); sec. 12–(3) and sec. 8–7 of the Town's zoning ordinance.

(7) The structures referred to in paragraphs (1) and (m) of the trial court's judgment violated sec. 3–A–(1) and 8; and sec. 3–B–(2), (3) and (4) of the Town's zoning ordinance.

(8) The porte-cochere, referred to in paragraph (g) of the court's judgment was ordered removed by order of the Town's Board of Adjustment, and appellants did not appeal from such order as provided in Art. 1011g, V.A.C.S.

(9) The structure known as the "S. S. Miramar" referred to in paragraph (k) of the trial court's judgment violates sec. 3–A (structural design) and B (permissible outhouses) of the Town's zoning ordinance.

Appellants say that sec. 3–A of the zoning ordinance is merely a limitation on the use of property and since they discontinued the illegal use of the "S. S. Miramar" in 1942, there is no violation of the zoning law.

■ We do not agree with appellants' interpretation of the ordinance. We quote from the ordinance: "In a single family Dwelling District a building shall be used for the following but only the following purposes and *every building erected or structurally altered shall be designed and arranged to be used, and thereby made adaptable to use, for only the following purposes.*" (Emphasis supplied.) The "S. S. Miramar" is not structurally designed or adapted to use as a single family dwelling. It was designed and structurally suitable only for commercial purposes as a

club room, museum, etc. That its design and structure is such is evidenced by appellants' own printed announcement, which stated that the structure could accommodate hundreds of persons and was available for private parties. Interested persons were invited to make arrangements with the purser, whose name and phone number were given in the announcement. Moreover appellants sought but were refused permission to use the structure as a club house for a proposed "International Club."

Appellants pled the Town's Ordinance No. 293, the zoning ordinance enacted July 3, 1929 "with amendments thereto." This ordinance was amended May 15, 1936 by Ordinance No. 377 and on August 6, 1945 by Ordinance No. 463. Neither Ordinance No. 377 nor Ordinance No. 463 was offered in evidence separately. But there was introduced in evidence "Ordinance No. 293 as amended by Ordinance 377 and 463." The original ordinance contained no open-space requirements. Such a provision was added in one of the amendments but it was not made certain whether it was added in the 1936 amendment or that of 1945. Appellants contend that under the circumstances only the structures built since August 6, 1945 could be said to have been erected in violation of the ordinance.

■ We overrule appellants' contention. The point was not raised by appellants in their pleadings, or by objection during the trial, or in their motion for new trial in the trial court, or even in their original briefs on appeal. Appellants raise the point for the first time in this motion for rehearing. Their complaint comes too late. Under the circumstances we must consider the point as having been waived by appellants. Rule 374, T.R.C.P.; Western Auto Supply Co. v. Clark, Tex.Civ.App., 253 S. W.2d 929, at page 931; Donalson v. Horton, Tex.Civ.App., 256 S.W.2d 693; Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979, at pages 984–985. The case was tried on the theory that the provision in question was in effect at all times material to the inquiry. This appeal must be decided on the same theory as that on which the case

was tried in the trial court. 3-B Tex.Jur. 275.

Appellants make a similar contention in regard to the Town's Ordinance No. 516, the Building Code, enacted November 6, 1950. It is asserted that there is no evidence that a building code requiring a building permit was in effect prior to November 6, 1950, hence only structures erected after said date as a matter of law could have been erected in violation of any ordinance requiring a building permit.

We overrule this contention also. What we have said about appellants' belated point with reference to the zoning ordinance applies here, too, so we shall not repeat it.

For another reason we consider untenable appellants' contention that there is no evidence in the record as to a building permit requirement prior to November 6, 1950. Both the caption and Section 10 of Ordinance No. 516 recite that it repeals Ordinance No. 294 enacted July 3, 1929. Section 10 of the new ordinance reproduces verbatim the caption of the old ordinance being repealed, and plainly shows that the old ordinance did require a building permit. We here reproduce Section 10, of Ordinance 516: "Section 10. This ordinance shall as of the day it becomes effective repeal Ordinance No. 294, passed by the Town Council of the Town of Highland Park on the 3rd day of July, 1929, and recorded in Vol. 4, page 225, Minutes of the Town of Highland Park, captioned as follows: 'An ordinance of the Town Council of the Town of Highland Park, Texas, requiring the taking out of a building permit by any person, firm, corporation or association desiring to erect, repair or demolish any building or structure within the Town of Highland Park; prescribing for the issuance of such permit by the building inspector and providing for public hearings before the Council where such permit is denied by the building inspector; prescribing a penalty for the violation thereof and repealing building permit ordinance heretofore passed.'"

Since rendition of our original judgment on appeal appellees have filed a written declaration to the effect that they desire to abandon with prejudice their cause of action relating to the issue of nuisance occasioned by the umbrella on the roof of the front porch of the main dwelling, and the height of the rear and side fences, and that part of the mandatory injunction requiring appellants to dismantle, raze and remove the structures named in paragraphs (i), (n), (p), and (q) of the trial court's judgment. The abandonment covers all the parts of the judgment which we reversed and remanded for new trial. We therefore modify our former judgment and affirm the trial court's judgment in favor of appellees Town of Highland Park and Kathleen Gibson restraining appellants from excluding from the premises in question the Town's building inspector, assistant building inspector, fire marshal and health officer; and we affirm also the mandatory injunction granted by the trial court in so far as it requires appellants to dismantle, raze and remove certain structures as set out in paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (j), (k), (l), (m), (o), (r), and (s).

Having so modified our judgment, we overrule appellants' motion for rehearing.